UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BARBARA L. GRAZIOLI,<br><br>          Plaintiff,<br><br>     v.<br><br>GENUINE PARTS COMPANY (d.b.a.<br>S.P. Richards Company),<br><br>          Defendant. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 03-2875 (JEI)<br><br>**OPINION** |

**APPEARANCES:**

FROST & ZEFF, ESQS.
By: Gregg L. Zeff, Esq.
430 Route 70 West
Cherry Hill, New Jersey 08002
     Counsel for Plaintiff

BROWN & CONNERY, LLP
By: William M. Tambussi
360 Haddon Avenue
P.O. Box 539
Westmont, New Jersey 08108
     Counsel for Defendant

**IRENAS**, Senior District Judge:

This is an employment discrimination suit filed by Barbara Grazioli against her former employer, S.P. Richards Company ("SPR"). Grazioli asserts that she was fired in retaliation for reporting her supervisor's sexual harassment and because she disclosed to SPR that she suffers from Chronic Obstructive Pulmonary Disease ("COPD"). Grazioli brings claims for hostile work environment discrimination and retaliation under Title VII and New Jersey's Law Against Discrimination ("NJLAD"), as well as

claims under the Americans With Disabilities Act ("ADA") and Family Medical Leave Act ("FMLA").  SPR moves for summary judgment on all counts.[1]

I.

Grazioli began her employment at SPR's Moorestown, New Jersey, branch as an administrative assistant in August, 1998.[2] Almost a year later, in the summer of 1999, Grazioli was relocated within the office to the Customer Service area due to the hiring of new employees.  She moved to a desk directly in front of Craig Brodsky, who became her supervisor.  In addition to a new desk and a new supervisor, Grazioli took on new responsibilities as a customer service representative.

Grazioli and Brodsky were friendly with each other and on a few occasions they socialized at parties outside the office. They also lived in the same apartment complex and sometimes shared rides to work.  Neither party asserts that there was any sort of romantic relationship between Grazioli and Brodsky.

Grazioli asserts that Brodsky's behavior at work changed after she got married in 2000 and progressively worsened until she was terminated in 2002.  When she returned from her honeymoon Brodsky allegedly commented to her that she "should be limping or

---

[1] We have subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

[2] SPR is an office supply products wholesaler and distributor.

look like [she] had a horse between [her] legs because [she] was riding [her husband] all weekend long." (Grazioli Dep. at 191)

On a daily basis thereafter Grazioli claims Brodsky, while sitting right behind her, sang in a woman's voice a song he made up that went "my pussy, my pussy, my tight little pussy." (Id. at 197) Once a week or more Brodsky allegedly commented on other female employees' genitalia and at least once told Grazioli that her breasts looked big. He often allegedly referred to a lesbian co-worker as a "pussy-licker." (Id. at 190) Grazioli testified that he was "constantly degrading" by "simulating a blow job" behind the backs of women who knelt down to retrieve items from Brodsky's filing cabinet. (Id. at 189) She maintains that "every time" Brodsky made a "sexual" or "vulgar" comment she told him "you're turning my stomach, you're a pig, can you not control yourself, there is something wrong with you." (Id. at 190) A few times Grazioli became so upset by Brodsky that she went to the bathroom at work and cried, and / or cried at home when she told her husband what happened. (Id. at 197; Nestor Dep. at 26)

Kelly Perkins, another female employee in the office, also testified that "Monday through Friday" Brodsky made "offensive, sexually related comments and hand gestures." (Perkins Dep. at 30-31) She described how Brodsky used words such as "fuck" and "cunt" and referenced "blow jobs" "as part of his general conversation throughout the day." (Id. at 31) She also

3

testified that "[h]e had a song that he sang every day, and he called it the pussy song.  And basically what it consisted of was that word with a melody, just repeated over and over and over again." (Id.)

Salina Nestor, a third female employee from the office, also testified that "two to three times a week" Brodsky used the word "pussy," often repeating it: "pussy, pussy, pussy, pussy . . . just like that."  (Nestor Dep. at 24)

Grazioli was terminated on April 1, 2002.  The parties' explanations for her termination vastly differ.  Grazioli contends she was fired because she finally put her complaints about Brodsky in writing[3] and recently disclosed to SPR that she had COPD.  SPR asserts that Grazioli was dismissed for dishonestly obtaining free dinner cruise tickets under the guise of planning an event on the company's behalf.

On Monday, February 4, 2002, Grazioli personally delivered a note to Eileen Fitzpatrick, Operations Manager at SPR's Moorestown branch and Brodsky's direct supervisor, after an incident which Grazioli characterized as "the last straw."  (Zeff Cert. Ex. E)  The previous Friday (February 1) Grazioli missed work to be with her sister who was having a baby.  (Grazioli Dep. at 207)  When Grazioli called into work, Brodsky was allegedly

---

[3]  Grazioli testified that she also verbally reported Brodsky's behavior to Fitzpatrick and Fisher several times in 2000 and 2001 but no action was taken. (Grazioli Dep. at 198-204)

"hysterical" about Grazioli's absence, using the words "fuck" and "stupid cunts" in reference to the other women in the office who "can't handle anything."[4] (Id.)

In her note, Grazioli wrote, "When you get a chance today please get with Frank Fisher[5] – I _need_ to schedule a meeting about the way Craig has been harrassing [sic] me – I deal with _a lot_ of things but I can't take the way he treats me anymore – Friday was the last straw!  Something needs to be done about it immediately." (Zeff Cert. Ex. E)(emphasis in original)

According to Grazioli, Fitzpatrick asked her why she was "being a shit-stirrer" but said Grazioli "would get an apology within two weeks." (Grazioli Dep. at 209)  Grazioli further asked for a meeting with Fisher but Fitzpatrick told her "not to involve him" and to "get the 'F' out of her office." (Id. at 213) When no other action was taken in response to her note, Grazioli alleges she verbally followed up with Fitzpatrick in mid-February and Fisher in early March but nothing was ever done. (Id. at 224-25)

Grazioli was diagnosed with COPD on March 18, 2002.  She asserts that she told Fitzpatrick about her diagnosis the next day, explaining that while she "would be okay," she might need to

---

[4]   This incident was particularly upsetting to Grazioli because her mother and sister overheard the conversation, including Brodsky's alleged remarks.

[5]   Fisher is the Human Resources Manager at the Moorestown branch.

take days off for doctor visits.  (Grazioli Dep. at 180)  Before
Grazioli's diagnosis, she once expressed concern about her health
to Brodsky.  (Id. at 179-80)  Brodsky allegedly responded that
she "better have the worst disease in the world" and that
Grazioli could "be gone" because SPR "doesn't like people taking
time off."  (Id.)  SPR disputes Grazioli's version of events,
claiming that she never told anyone at SPR that she had COPD.

Prior to her COPD diagnosis, Grazioli took three separate
short term disability leaves for respiratory infections.[6]  (Id.
at Exs. D-13 – D-16)  Each time she requested leave she signed
SPR's Short Term Disability Benefits Application which read: "*I
understand that while out on Short Term Disability my time will
count toward Family Medical Leave.*" (Id.)(emphasis in original)
Thus, SPR asserts that they provided Grazioli FMLA leave
concurrent with her short term disability leave.  While Grazioli
does not dispute that she was granted short term disability
leave, she does dispute that she was also granted concurrent FMLA
leave.

SPR asserts that Grazioli was fired because of one incident
involving the Spirit of Philadelphia, a dinner cruise company.
The parties do not dispute that Grazioli completed and returned
Spirit of Philadelphia's business reply card which offered a free

---

[6]   Grazioli requested leave three times for upper respiratory infections
and once for a "finger / hand injury."  Her longest leave of absence was ten
days for the hand injury.  The shortest absence was one day. (Grazioli Dep.
Exs. D-13 – D-16)

promotional dinner cruise for corporate event planners.   (Zeff
Cert. Ex. H)   Lynde Wolk, the Business Account Manager for Spirit
of Philadelphia, called Grazioli on February 27, 2002, to
determine whether Grazioli was eligible for the free cruise.   The
parties dispute exactly what Grazioli said during the telephone
conversation.   However, they agree that Grazioli told Wolk that
she planned events for SPR.[7]   Shortly thereafter, Spirit of
Philadelphia sent two complimentary tickets to Grazioli's
attention at SPR.   Grazioli claims she never received the tickets
but if she had, she would have given them to Fitzpatrick.

Fitzpatrick and Fisher, apparently learned the details about
Grazioli's arrangements with Spirit of Philadelphia from Wolk.[8]
Based on information from Wolk and the unexplained appearance of
Wolk's business card on Fisher's desk,[9] Fitpatrick and Fisher
concluded that Grazioli made misrepresentations to Spirit of
Philadelphia in order to get free tickets for her personal use.
Fitzpatrick contacted SPR's headquarters in Smyrna, Georgia, to

---

[7]   The parties dispute Grazioli's specific job title and the scope of
her responsibilities and authority at SPR.   SPR makes much of the fact that
Grazioli is officially a customer service representative and not an event
planner.   Grazioli asserts that she helped make arrangements for company
events many times during her four years at SPR. SPR responds that planning
events was not part of her job responsibilities, she did not have authority to
make plans, and she failed to inform Spirit of Philadelphia of this
information.

[8]   The parties dispute who called whom but apparently Fitzpatrick spoke
with Wolk on the telephone and Fitzpatrick relayed the information to Fisher.

[9]   Wolk said she included a business card with the free tickets.
Fitzpatrick and Fisher concluded that the free tickets must have reached the
office because of the appearance of the business card.

request assistance in "investigating" Grazioli's

"misrepresentations."   (Fitzpatrick Dep. at 183)   In response to

headquarters' directive to "document" the situation, Fitzpatrick

immediately drafted a four paragraph memorandum which was

received and reviewed by Henry Martin, Vice President of Human

Resources, detailing all that she had discovered and concluded.

(See Fitzpatrick Dep. Ex. 9)   Relying solely on the memorandum

and telephone communications with Fitzpatrick and Fisher, Martin

decided that Grazioli's conduct warranted termination.   (Martin

Decl. ¶ 15)   According to SPR, the discovery of Grazioli's

communications with Spirit of Philadelphia, Fitzpatrick's

communication with headquarters, Fitzpatrick's creation of the

memorandum, and Martin's decision to fire Grazioli all occurred

on March 15, 2002.

Although Martin states that he had already made the decision

to terminate Grazioli, he decided to wait to tell Grazioli until

completing further investigation. (Id.)   The investigation

included a meeting between Grazioli, Fitzpatrick, and Fisher on

March 22, 2002.   Grazioli acknowledged sending the business reply

card.   She was immediately placed on suspension and then

terminated on April 1, 2002.

## II.

"[S]ummary judgment is proper 'if the pleadings,

8

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting **Fed. R. Civ. P.** 56(c)).   In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).   "'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).   The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.

### A.

Grazioli asserts that Brodsky's conduct created a hostile work environment which violated her rights under Title VII and New Jersey's Law Against Discrimination.

9

Title VII of the Civil Rights Act of 1964 prohibits workplace discrimination because of an individual's sex, *see* 42 U.S.C. § 2000e-2(a)(1), as does NJLAD.  *See* N.J.S.A. § 10:5-12(a).  "Sexual harassment is a form of sex discrimination that violates both Title VII and the LAD."  *Lehman v. Toys 'R' Us, Inc.*, 132 N.J. 587, 601 (1993) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986)).  An employer will be liable for hostile work environment sexual harassment when a plaintiff proves that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would have detrimentally affected a reasonable person of the same sex, in like position; and (5) a basis for respondeat superior liability.  *Kunin v. Sears Roebuck Co.*, 175 F.3d 289, 293 (3d Cir. 1999) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990)).[10]  SPR asserts that Grazioli cannot establish (1) through (4) and makes no argument with regard to (5), asserting that addressing respondeat superior liability is unnecessary because Grazioli has failed to raise disputed issues of fact with regard to the first four prongs of

---

[10]   Because the hostile work environment analyses for Title VII claims and NJLAD claims are "strikingly similar" the Court will analyze both simultaneously.  *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005); *see, e.g., Hargrave v. County of Atlantic*, 262 F. Supp. 2d 393, 411 n.7 (D.N.J. 2003)("this Court's analysis of Plaintiff's allegations of sexual and racial harassment applies equally to both her Title VII and NJLAD hostile work environment claims.").

the hostile work environment analysis.

(1)

A plaintiff establishes the first prong of the analysis by showing that the alleged hostile acts were "sex-based" or "gender-based." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (Title VII prohibits discrimination "'because of sex'"). The record establishes that Brodsky commonly used derogatory words for women's reproductive anatomy such as "pussy" and "cunt." He sang his "pussy song" in a woman's voice. He had at times, simulated "blow jobs" behind women's backs. Brodsky also once commented on Grazioli's breast size and made direct comments to her regarding her sexual relationship with her husband. This is sufficient to establish that Brodsky's behavior was based on gender. *See Andrews v. City of Phila.*, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990)("the intent to discriminate on the basis of sex in cases involving . . . sexually derogatory language [] should be recognized as a matter of course.").[11]

---

[11] *See also Smith v. Exxon Mobil Corp.*, No. 02-4425, 2005 U.S. Dist. LEXIS 14965 at *43-44 n.33 (D.N.J. July 19, 2005)(denying employer's summary judgment motion, noting that "[t]he term 'cunt' describes female pudenda, or the female external genital organ. It is also defined as 'a woman regarded as a sexual object.'. . . the term . . . is usually considered 'obscene.'")(citing Webster's Third New Int'l Dictionary 222 (1993)); *Pappas v. J.S.B. Holdings, Inc.*, 392 F. Supp. 2d 1095, 1104 (D. Ariz. 2005)("misogynistic" language such as "cunt" and "bitch" could be reasonably interpreted by a jury to be sex-based); *Lawyer v. Eck & Eck Mach. Co.*, 197 F.

11

The Court rejects SPR's argument that Grazioli cannot establish that Brodsky's conduct was gender-based because he engaged in the complained-of conduct "in front of all employees in the office." (Pl.'s Brief in Supp. of Mot. for Sum. Judg. at 4) This argument fails for two reasons.

First, the record is significantly devoid of any evidence that Brodsky used the same (or analogous) derogatory language in reference to male employees or that he simulated "blow jobs" behind male employees' backs. Nor is there any evidence that Brodsky commented on male employees' genitalia at all, much less on a weekly basis as Grazioli and others assert he did with female employees. *Cf. Thomas v. Town of Hammonton*, 351 F.3d 108, 117 (3d Cir. 2003) (summary judgment was inappropriate where "trier of fact could infer that the hostile environment experienced by [plaintiff] would not have existed if she had been a man.").

Second, as the Third Circuit explained in *Thomas*, even if a woman and man are treated alike "it would not necessarily follow that no sex discrimination occurred." *Id.* at 117. "'It blinks reality to claim that sexual conduct which demeans women by a man in a position of power, even if not directed at a specific woman victim, equally impacts male and female subordinates. This

---

Supp. 2d 1267, 1275 (D. Kan. 2002)(supervisor's use of the word "pussy" in reference to plaintiff's genitals "went beyond the mere use of vulgarity" and constituted "gender-related conduct designed to humiliate" plaintiff).

disparate effect is the discriminatory element in a hostile environment.'" *Id.* at 118 (quoting *Hutchinson v. Amateur Elec. Supply, Inc.*, 351 F.3d 1037, 1043 (7th Cir. 1994)); *see also Lehmann*, 132 N.J. at 611 ("we hold that the plaintiff need not personally have been the target of each or any instance of offensive or harassing conduct.").

In *Thomas,* the Court held that a reasonable jury "could easily find a reasonable woman in [plaintiff's] position would be intimidated, in a way not experienced by a male" by a presentation that was "disparaging of women," which used 'bitch' as a synonym for 'problem' and made "references to women as 'pussies.'" *Id.* at 117-18.

Accordingly, this Court has no trouble concluding that Brodsky's frequent singing of "the pussy song," his common use of other words disparaging of women as well as his other alleged behavior is sufficient evidence from which a reasonable jury could conclude that Brodsky's behavior was gender-based.

(2)

In addition to being gender-based, the alleged conduct must be pervasive and regular.[12]  "Harassment is pervasive when

_____

[12] The applicable NJLAD standard is disjunctive: "severe *or* pervasive." *Lehmann,* 132 N.J. at 591 (emphasis supplied).  Because we hold the alleged conduct was pervasive, the Court need not explore the potential differences, if any, between Title VII and NJLAD with respect to this element of a hostile work environment claim.
  Further, the Third Circuit's Title VII "pervasive and regular" standard

13

incidents of harassment occur either in concert or with regularity." *Andrews*, 895 F.2d at 1484 (internal quotation omitted). "A few isolated incidents" do not suffice. *Kidd v. MBNA Am. Bank, N.A.*, 93 Fed. Appx. 399, 402 (3d Cir. 2004); *King v. City of Phila.*, 66 Fed. Appx. 300, 305 (3d Cir. 2003) (two "isolated and sporadic incidents . . . do not demonstrate the pervasive atmosphere of harassment required to prove a Title VII violation.").

Grazioli has presented evidence that over the course of approximately two years Brodsky sang the "pussy song" throughout the office on a daily basis. "Monday through Friday" Brodsky made "offensive, sexually related comments and hand gestures." (Perkins Dep. at 30-31) Grazioli also asserts that Brodsky commented on female employees' genitalia at least once a week. We hold that such frequency of action throughout the office is sufficiently pervasive and regular to establish a hostile atmosphere.[13]

---

admittedly differs from the U.S. Supreme Court's Title VII "severe or pervasive" standard articulated in *Harris* and *Oncale*. *See Abramson v. William Paterson College*, 260 F.3d 265, 277 n.6 (3d Cir. 2001) (recognizing difference in standards). However, we conclude, as the Third Circuit did in *Abramson*, that both tests are fulfilled when a plaintiff establishes regular and pervasive conduct. *Id.*

[13] Counsel for SPR emphasizes that the undisputed evidence shows that Brodsky never physically touched Grazioli. While physical touching would certainly be highly probative evidence of sexual harassment, the Court is skeptical of the converse position espoused by SPR's counsel– namely that the absence of physical touching is necessarily probative of the absence of a hostile environment. Plaintiffs have prevailed on hostile environment sexual harassment claims without evidence of physical touching. *See, e.g., EEOC v. Fed. Express Corp.*, No. 02-1194, 2005 U.S. Dist. LEXIS 5834 at *10 (M.D. Pa. 2005) ("Defendant notes that Intervenor 'was not subject to any offensive

Also, this pervasive and regular behavior, considered together with (a) the derogatory nature of Brodsky's behavior; (b) Brodsky's proximity to Grazioli (his desk was directly behind hers); and (c) his supervisory position is sufficient evidence of the severity of his conduct.

(3)

Grazioli must also establish that Brodsky's behavior detrimentally affected her.  As the Supreme Court observed in *Harris v. Forklift Systems*:

> A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.  Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their . . . gender . . . offends Title VII's broad rule of workplace equality.

510 U.S. 17, 22 (1993).  Thus, because Grazioli must only establish that she subjectively perceived her work environment to

---

touching or sexual demands.'. . . Defendant's arguments mock the severe and invidious discrimination to which Intervenor attested. Intervenor established that her co-worker . . . regularly used sexually crude, vile, and offensive language in front of her. . . . Further testimony indicated that [her co-worker] used similarly vulgar and offensive language to describe females generally, and made other comments about women and their sex lives in front of Intervenor and other employees.").

be hostile or abusive, and not that she suffered "concrete psychological harm," she has a relatively low hurdle to clear. *Id.; see also Lehmann*, 132 N.J. at 611 ("We find no support in [NJLAD] for engrafting a requirement of serious psychological harm before a plaintiff can state a claim.").

Genuine issues of disputed fact exist as to whether Graziloi subjectively perceived Brodsky's behavior as hostile or abusive. Grazioli testified that she viewed Brodsky's conduct as "constantly degrading" (Grazioli Dep. at 189). On several occasions, he upset her enough that she cried. In her note to Fitzpatrick she said she "could not take" Brodsky's "harassing" her. Additionally, Grazioli has submitted a report from Stephanie Eastman, a counselor at Life Counseling Services, who observes, "Ms. Grazioli is persistently overwhelmed and fearful in regard to the harassment [she suffered at work] and thus tries to avoid any thing [sic] associated with the harassment issue (especially seeing the harasser . . .)." (Zeff Cert. Ex. P)

On the other hand, SPR has presented substantial evidence that Grazioli continued to associate with Brodsky outside of work, sometimes initiating the contact. For example, Grazioli testified that while she was suspended from work, she called Brodsky to ask him if he would come to her home to fix her personal computer. (Grazioli Dep. at 139, 141)

SPR also points to undisputed evidence that Grazioli once

16

used the word "dickhead" to describe another male supervisor in a conversation with Brodsky  (Id. at 193; Brodsky Decl. ¶ 7) and that Grazioli testified at an unemployment hearing that "I thought my job was great . . . everything's hunky-dorey." (Grazioli Dep. at 286)

While this evidence casts doubt on whether Grazioli genuinely perceived Brodsky's behavior as hostile or abusive, we cannot conclude on this record that no reasonable jury could find for Grazioli.  A reasonable jury could find that while Grazioli used the word "dickhead" once, she nonetheless perceived Brodsky's pervasive and regular singing of "the pussy song" among other things, as degrading.  Likewise, a jury could reasonably reconcile Grazioli's continued interactions with Brodsky (her neighbor and direct supervisor) with her asserted perception of a hostile work environment.  Finally, while the undisputed evidence shows Grazioli testified she thought her job was "great," the entire statement read in context is not so unequivocal as to warrant summary judgment for SPR.[14]

---

[14]    Grazioli made the statement in an unemployment hearing when describing the circumstances of her suspension on March 22, 2002: "This is what happened, everything was fine.  I didn't get any written notices, everything was great in my life, I thought my job was great, all these people were in my wedding, everything's hunky-dorey.  I get called into the office on the 22nd, the operations manager was in there and the human resources person was in there."  (Grazioli Dep. at 285-86)  Viewing the evidence in the light most favorable to Grazioli, a reasonable jury could interpret her statement as an expression of surprise at her suspension, rather than a statement about how she perceived her work environment and Brodsky's behavior in particular.

(4)

"Conduct that is not severe or pervasive enough to create and objectively hostile or abusive work environment– an environment that a reasonable person would find hostile or abusive– is beyond Title VII's purview." *Harris*, 510 U.S. at 21. Brodsky's alleged behavior would detrimentally affect a reasonable woman in Grazioli's position.

As explained above, the Third Circuit held in *Thomas* that a reasonable jury "could easily find a reasonable woman in [plaintiff's] position would be intimidated" by a presentation that was "disparaging of women," which used 'bitch' as a synonym for 'problem' and made "references to women as 'pussies.'" 351 F.3d at 117-18.  Similarly, we hold that a reasonable woman in Grazioli's position would find the pervasive, regular and severe nature of Brodsky's conduct to be demeaning, hostile and abusive. *See also Taylor v. Cameron Coca-Cola Bottling Co.,* No. 96-1122, 1997 U.S. Dist. LEXIS 12114 at *20-26 (W.D. Pa. March 27, 1997)(reasonable woman in plaintiff's position would be detrimentally affected by daily remarks about plaintiff's breasts and comments on plaintiff's sexual relations with her husband); *Harley v. McCoach*, 928 F. Supp. 533, 539 (E.D. Pa. 1996)("An objectively hostile work environment can arise from frequent use of insulting and derogatory language relating to women.").

(5)

Under Title VII, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a superior with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). The rule is the same under NJLAD. *See Smith v. Exxon Mobil Corp.*, 374 F. Supp. 2d 406, 421-22 (D.N.J. 2005) (citing *Entrot v. The BASF Corp.*, 359 N.J. Super. 162, 181 (App. Div. 2003)).

The record is unclear about whether Brodsky was Grazioli's supervisor for purposes of a vicarious liability analysis. Both parties identify Brodsky as the Office Manager and Grazioli's "supervisor" but the record indicates that he did not have the authority to fire her.[15] On the other hand, Brodsky testified that he evaluated Grazioli's job performance though it is unclear what he specifically evaluated and to whom, if anyone, he reported the evaluations. (Brodsky Dep. at 15)  There is no other evidence in the record with regard to Brodsky's authority, or lack thereof, over Grazioli.

The parties have not briefed the question of which legal

---

[15]   The parties agree that the only person who had authority to terminate Grazioli was Henry Martin, Vice President of Human Resources at SPR's headquarters in Smyrna, Georgia.

standard should govern this issue.[16]  More importantly, however, we find no evidence in the record fleshing-out Brodsky's authority over Grazioli.  We hold that this insufficiently developed record raises factual questions which preclude summary judgment for SPR.[17]

Further, even if we were to conclude that Brodsky was not Grazioli's supervisor, summary judgment would still be inappropriate.  Non-supervisory co-workers' actions may create liability for the employer where the employer "knew or should have known of the harassment and failed to take prompt remedial action."  *Kunin*, 175 F.3d at 293-94; *see also Smith*, 374 F. Supp. 2d at 422 (similar standard applies in NJLAD cases).  Grazioli has put forth evidence that Fitzpatrick and Fisher knew about Brodsky's behavior and failed to take appropriate action.  On one

---

[16]  Neither the U.S. Supreme Court nor the Third Circuit have given explicit guidance on how to determine when someone is a "supervisor" for Title VII purposes.  The Equal Employment Opportunity Commission ("EEOC") guidelines state that "an individual qualifies as an employee's 'supervisor' if: (a) the individual has authority to undertake or recommend tangible employment decisions affecting the employee; or (b) the individual has authority to direct the employee's daily work activities."  EEOC Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors, 8 FEP Manual (BNA) 405:7654 (1999).  At least three district court decisions within this Circuit have employed the EEOC's standard and the Second Circuit has expressly adopted it.  See *Mack v. Otis Elevator Co.*, 326 F.3d 116 (2d Cir. 2003).  Other Circuits have rejected the EEOC definition in favor of a more narrow definition.  *See, e.g., Rhodes v. Ill. D.O.T.*, 359 F.3d 498, 509 (7th Cir. 2004); *Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1056-57 (8th Cir. 2004).

[17]  We also note that under NJLAD, New Jersey courts have articulated a broad definition of "supervisor."  *See Entrot*, 359 N.J. Super. at 181 (identifying "indicia" that would support a conclusion that a co-worker was a supervisor, including "whether the power the offending employee possessed was reasonably perceived by the victim, accurately or not, as giving that employee the power to adversely affect the victim's working life.")

occasion, Fitzpatrick allegedly called Grazioli a "shit-stirrer"
in response to Grazioli's complaints.  Grazioli has also put
forth evidence that Fitzpatrick promised to speak with Fisher
about her problem but did not.  Therefore summary judgment for
SPR is inappropriate for this reason as well.


**B.**

Grazioli brings Title VII and NJLAD retaliation claims
alleging that her written complaint to Fitzpatrick about
Brodsky's harassment prompted her termination.[18]

Title VII prohibits employers from discriminating against an
employee because she has "made a charge, testified, assisted or
participated in any manner in an investigation, proceeding, or
hearing under this subchapter."  42 U.S.C. § 2000e-3(a).
Similarly, NJLAD prohibits "any person [from taking] reprisals
against any person because that person has opposed any practices
or acts forbidden under this act or because that person has filed
a complaint, testified or assisted in any proceeding under this
act."  N.J.S.A. § 10:5-12(d).

---

[18]  SPR asserts in its papers that Grazioli "failed to effectively plead
a claim for retaliation in her Complaint."  (Def's Br. in Supp. of Sum. Judg.
at 2 n.2)  Grazioli pled in her Complaint that her termination was
"pretextual" and requested relief in the form of a declaration that SPR's
"discriminatory and retaliatory acts" violated her rights and an injunction
preventing SPR from taking "any other retaliatory action" against her.  The
Court finds this sufficient under the liberal notice pleading rules employed
by the federal courts.  See Fed. R. Civ. P. 8(a);  Weston v. Pennsylvania, 251
F.3d 420, 429 (3d Cir. 2001)(Title VII plaintiffs "need not plead law or match
facts to every element of a legal theory.").

Analyses under both statutes are essentially the same. Grazioli has the burden of proving that: (1) she engaged in protected activity known to the employer; (2) she was subsequently subjected to an adverse employment decision by the employer; and (3) a causal link exists between (1) and (2). *Cortes v. Univ. of Med. and Dentistry of N.J.*, 391 F. Supp. 2d 298, 311-12 (D.N.J. 2005)(citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997)); *Smith*, 374 F. Supp. 2d at 419 (citing *Romano v. Brown & Williamson Tobacco Corp.*, 284 N.J. Super. 543, 548-49 (App. Div. 1995)).  If Grazioli establishes all three elements of a prima facie case of retaliation, the burden of production shifts to SPR to provide a "legitimate, non-discriminatory" reason for its actions.  *See McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).  If SPR carries its burden, Grazioli must prove that the proffered reason for the adverse employment action was pretextual. *Id.* at 802-04; *Smith*, 374 F. Supp. 2d at 419.

There is no genuine dispute that Grazioli's termination was an adverse employment decision.  Nor do the parties dispute that SPR has provided a non-discriminatory reason for Grazioli's termination, i.e., the Spirit of Philadelphia incident.  Thus, we address only Grazioli's protected activity, causation, and pretext.

Under Grazioli's theory of the case, SPR was prompted to

22

terminate her in the wake of her written note to Fitzpatrick, a management employee of SPR, in which she expressed her urgent need to address "harassment" by Brodsky.  (See Zeff Cert. Ex. E) In an apparent attempt to avoid Grazioli's evidence that Fitzpatrick and Fisher knew of her hostile work environment complaint, SPR argues that Martin, "the sole decision-maker with respect to [Grazioli's] termination" did not know of her complaints.  (Def.'s Br. at 22)

With respect to Title VII claims, the Third Circuit has held that "informal complaints of discrimination that were directed at co-workers rather than management constitute protected activity for purposes of establishing a prima facie case of retaliation." *Hazen v. Modern Food Servs.*, 113 Fed. Appx. 442, 444 (3d Cir. 2004)(citing *Neiderlander v. Am. Video Glass Co.*, 80 Fed. Appx. 256, 259 (3d Cir. 2003)).  Here Fitzpatrick and Fisher *were* management.  The fact that they did not have ultimate authority to terminate Grazioli is a distinction without a difference since co-workers also lack such authority.

We also conclude that Grazioli has satisfied the first prong under NJLAD.  Although NJLAD explicitly requires that the protected activity be "known" to the employer, Grazioli alleges that Fitzpatrick and Fisher, management employees, did know of her complaints.  We cannot interpret NJLAD to exclude this conduct from its protection just because neither Fitzpatrick nor

23

Fisher had the ultimate power to take the alleged retaliatory action that resulted.

SPR's argument is more properly characterized as an attack on causation, not protected activity.  As other courts have noted, the first prong's knowledge requirement is effectively incorporated in the causation prong.  *See Hargrave*, 262 F. Supp. 2d at 424 n.13.

Causation may be proven by "circumstantial evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action."  *Kachmar v. Sunguard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (internal quotations omitted).  Specifically, evidence of temporal proximity between the protected activity and the adverse employment action may establish causation.  *Id.*  Even in the absence of temporal proximity, causation may be established by a "pattern of antagonism" following the protected conduct.  *Id.* (internal quotations omitted).  However, these factors are not the exclusive indicia of causation.  "The proffered evidence, looked at as a whole, may suffice to raise the inference [of causation]," *id.*, including evidence that the employer's explanation for the adverse action was pretextual.  *Weston v. Pa.*, 251 F.3d 420, 432 (3d Cir. 2001); *Zelinski v. Pa. State Police*, 108 Fed. Appx. 700, 707 (3d Cir. 2004).

Grazioli submitted her written note to Fitzpatrick on

24

February 4, 2002.[19]  She testified that she verbally followed-up on her note with Fitzpatrick in mid-February and then approached Fisher in mid-March.  SPR asserts that the decision to terminate Grazioli was made on March 15, 2002.

Additionally, Grazioli's complaints were met with some hostility.  When Grazioli delivered her note, Fitzpatrick allegedly called Grazioli a "shit-stirrer," questioned why she was acting in this manner, and then directed Grazioli to "get the 'F' out of her office."  (Grazioli Dep. at 209)  While Fitzpatrick also promised Grazioli that she would "definitely" have an apology in "two weeks," no apology was ever given.  (Id.)  When Grazioli later followed-up with Fitzpatrick, Fitzpatrick said she would speak with Fisher about the complaint. (Id. at 224)  However, when Grazioli went to Fisher herself on March 13, 2002, Fisher told her that Fitzpatrick had not discussed Grazioli's complaint with him. (Id. at 227)

The short amount of time between Grazioli's note and subsequent inquiries on one hand, and the termination decision on the other, considered together with evidence of hostility and reluctance to address Grazioli's concerns, is sufficient to warrant an inference of causation in Grazioli's favor for

---

[19]  Grazioli testified that she also verbally reported Brodsky's behavior to Fitzpatrick and Fisher several times in 2000 and 2001 but no action was taken. (Grazioli Dep. at 198-204)

purposes of summary judgment.[20]

We conclude that Grazioli has raised material issues of fact
with regard to causation notwithstanding SPR's undisputed
assertions that Martin was unaware of Grazioli's complaints when
he made the termination decision.  The undisputed evidence
demonstrates that Martin's decision was based exclusively on
information provided to him by Fitzpatrick and Fisher, the branch
managers.  Martin was located in Georgia.  There is no evidence
in the record that Martin ever made any independent investigation
of facts before he decided to terminate Grazioli.  Indeed, the
first time Martin learned of Grazioli's existence was during
Fitzpatrick's first communication with him on March 15.  (Martin
Dep. at 50)

The undisputed record indicates that Fitzpatrick and Fisher
controlled all of the information Martin received.  While
Fitzpatrick's memorandum did not recommend any particular
disciplinary action against Grazioli, Fitzpatrick did conclude,
"This disturbs me that an employee would take it upon themselves
to represent SP Richards without our knowledge, for personal
gain."  (Fitzpatrick Dep. Ex. 9)  Under the company's code of
conduct, such action was ground for immediate termination.

Grazioli asserts that Fitzpatrick and Fisher manipulated the
information they provided to Martin in order to obtain the result

---

[20]  This inference is reinforced by the evidence of pretext which the
Court will address shortly.

they desired -- her termination.  In support of her theory, she has raised factual questions about Fitzpatrick's and Fisher's willingness to pursue her complaint.  Additionally, the parties dispute whether Fitzpatrick and Fisher ever informed Martin that Grazioli had helped plan several other events for the Moorestown branch before (Martin Dep. at 56-57), and whether Fitzpatrick and Fisher informed Martin that Grazioli said she intended to give the Spirit of Philadelphia tickets to Fitzpatrick.  (Id. at 58)

This evidence, taken as a whole, is sufficient to allow Grazioli to put her theory of the case to a jury.  If she is successful in proving by a preponderance of the evidence that Fitzpatrick and Fisher effectively influenced Martin's decision by controlling the information upon which he based his decision, her retaliation claim will not fail for lack of causation.  See Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 200-01 (3d Cir. 1996) ("[Plaintiff] presented sufficient evidence to allow a rational jury to find that her supervisors (who were aware of her discrimination complaints) possessed a retaliatory intent, and thus tainted the ultimate decision [made by upper level management]. . . . the jury could have rationally inferred that the Chicago decision-makers . . . were not the effective decision-makers, but rather their decision to fire [plaintiff] was influenced by her managers in New Jersey.")

Grazioli has also satisfied her summary judgment burden as

to pretext.  To make a sufficient showing of pretext, a plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in an employer's reasons that a reasonable factfinder could rationally find them unworthy of credence.  *Abramson*, 260 F.3d at 283 (3d Cir. 2001).

The undisputed evidence shows that the discovery of Grazioli's communications with Spirit of Philadelphia, Fitzpatrick's communication with headquarters, Fitzpatrick's creation of the memorandum, and Martin's decision to fire Grazioli all occurred in one day.  The unusual speed with which the investigation occurred, including the fact that no one asked Grazioli for her side of the story before concluding that her actions warranted termination (Martin Decl. ¶ 15), raises questions about SPR's proffered reason for termination.

Additionally, serious factual disputes exist as to the procurement and receipt of the dinner cruise tickets and whether Grazioli intended to use them herself or give them to management. Grazioli testified that she never received the tickets and in any event, she intended to give them to Fitzpatrick.  Grazioli further suggests that management orchestrated her termination by intercepting and opening the mail containing the tickets.  These disputes are more appropriately resolved by a jury, not at summary judgment.

We conclude that the totality of the evidence demonstrates weaknesses and implausibilities in SPR's reason for termination which preclude summary judgment for SPR.  *See Jones v. Sch. Dist. Of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999) ("a plaintiff may satisfy [the pretext standard] by demonstrating, through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason.") (internal quotations omitted).

### C.

Grazioli argues alternatively, or additionally, that her termination violated the ADA's and NJLAD's prohibitions against retaliation against a person with a disability.

"The ADA provides: 'No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by the ADA or because such individual made a charge under the ADA.' 42 U.S.C. § 12203(a).  Thus, it is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004)(citing *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003)).  Likewise, as stated above, NJLAD prohibits "any person [from taking] reprisals

29

against any person because that person has opposed any practices
or acts forbidden under this act or because that person has filed
a complaint, testified or assisted in any proceeding under this
act."  N.J.S.A. § 10:5-12(d).

To establish a prima facie case of retaliation under the
ADA, a plaintiff must show: (1) protected employee activity; (2)
adverse employment action by the employer either after or
contemporaneous with the employee's protected activity; and (3) a
causal connection between the employee's protected activity and
the employers adverse action.  *Williams*, 380 F.3d at 759.  The
same elements establish a case of retaliation under NJLAD.  *See*
*Buffa v. N.J. State Dep't of Judiciary,* 56 Fed. Appx. 571, 576
(3d Cir. 2003).

There is no evidence in the record that Grazioli engaged in
protected activity under the ADA or NJLAD.  Grazioli did not
oppose any practice made unlawful by the ADA or NJLAD.  Nor did
she request accommodations for a disability.  *See Williams*, 380
F.3d at 759.  She merely alleges that she informed SPR that she
was recently diagnosed with COPD[21] and she might need to attend
doctors' appointments in the future.

Because Grazioli has failed to demonstrate that she engaged

---

[21]  The record does not indicate what symptoms are associated with COPD.
Notably, although Grazioli asserts that she was diagnosed with COPD in March,
2002, she has produced only one document, dated December 1, 2004, to support
her assertion.  The document is a letter from her family practitioner to her
attorney which does not establish the date of diagnosis.

in protected activity under either the ADA or NJLAD, summary
judgment for SPR will be granted.

### D.

Grazioli's third asserted reason for her termination is that
SPR regarded her as disabled (even though she was not actually
disabled) in violation of the ADA and NJLAD.[22]  In opposition to
SPR's motion for summary judgment, Grazioli has put forth
evidence that she was "terminated days after revealing to
Defendant that she suffered from COPD (March 19, 2002, to March
22, 2002)- a previously undiagnosed illness which had required
that she take several days off earlier in the year and would
require future time off for doctor's visits."  (Pl.'s Opp. Br. at
14)  She also points to a statement Brodsky made about SPR not
tolerating illness absences.  This evidence fails to establish a
prima facie case under either the ADA or NJLAD.

The ADA prohibits "discrimination against a qualified
individual with a disability because of the disability of such
individual."  42 U.S.C. § 12112(a).  An individual is disabled if
she has "(A) a physical or mental impairment that substantially
limits one or more of the major life activities of an individual;
(B) a record of such an impairment; or (C) [is] regarded as

---

[22]  The parties agree that Grazioli's COPD was not a physical impairment
that substantially limited one or more of her major life activities.  *See* 42
U.S.C. § 12102(2)(A).

31

having such an impairment." § 12102(2). Likewise, NJLAD
prohibits discrimination based on the perception of handicap.
*Gimello v. Agency Rent-A-Car Sys.*, 250 N.J. Super. 338, 365 (App.
Div. 1991); *Poff v. Caro*, 228 N.J. Super. 370, 377 (Law Div.
1987).

A person is "regarded as" having a disability if she has:
(1) a physical or mental impairment that does not substantially
limit major life activities but is treated by the covered entity
as constituting such limitation; (2) a physical or mental
impairment that substantially limits major life activities only
as a result of the attitudes of others toward such impairment; or
(3) no such impairment but is treated by a covered entity as
having a substantially limiting impairment. 29 C.F.R.
§ 1630.2($\ell$); *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 381 (3d
Cir. 2002).

Thus, to successfully oppose summary judgment in this case,
Grazioli must establish that she has a non-limiting impairment
that SPR mistakenly believed limited her major life activities.
*See Tice v. Ctr. Area Trans. Auth.*, 247 F.3d 506, 514 (3d Cir.
2001) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489
(1999)). "The definition of 'substantially limits' remains the
same as it does in other parts of the statute- i.e., if the
individual is attempting to establish that the employer believed
the individual to be limited in the life activity of 'working,

then 'working' must encompass a broad class of jobs." *Id.*; *see also Rinehimer*, 292 F.3d at 381 ("to be covered under the 'regarded as' prong of the ADA the employer must 'regard the employee to be suffering from an impairment within the meaning of the statutes, not just that the employer believed the employee to be somehow disabled.'").

Grazioli has failed to identify any evidence in the record establishing that anyone at SPR believed that COPD limited her in any way.

In *Rinehimer*, the Third Circuit held, "[t]he awareness that an employee is sick combined with some change in his work assignments is not enough to satisfy the 'regarded as' prong of the ADA." 292 F.3d at 382. In that case, all the plaintiff had established was that the employer was aware that the plaintiff was having breathing difficulties. *Id.* Because the plaintiff offered no evidence about her employer's "perception about the severity of his condition" the Court affirmed summary judgment for the employer. *Id.*; *see also Kelly v. Drexel Univ.*, 94 F.3d 102, 106 (3d Cir. 1996) (the fact that employer was aware that plaintiff walked with a limp, on its own, was insufficient to show that the employer regarded plaintiff as disabled).

Likewise here, even drawing all inferences in favor of Grazioli, we cannot conclude that SPR viewed her as substantially limited by her COPD. Grazioli points to Brodsky's statement to

her that she "had better have the worst disease in the world" as evidence of SPR's perception. (Pl.'s Opp. Br. at 14) His statement is speculative at best. It does not appear, under any interpretation, that he, or anyone else, believed Grazioli was actually limited by her illness.[23] Indeed, at the time, she herself did not know that she had a chronic condition or that she would need future doctor's visits because she had not yet been diagnosed with COPD.

Moreover, the Court cannot infer from her previous absences that SPR could have perceived her as substantially limited by her illness. Grazioli has established that she took three short term disability leaves for respiratory infections during her tenure at SPR. (Grazioli Dep. Exs. D-13 - D-16) She was only absent on leave a total of 15 days (including four weekend days) from January, 2000, to February, 2002. Even coupled with the timing of Grazioli's termination, the Court cannot infer from these facts that SPR perceived Grazioli to be disabled.

Grazioli has failed to put forth any evidence that SPR perceived her as disabled, therefore she has failed to make out a prima facie case under either the ADA or NJLAD and summary judgment for SPR will be granted.

---

[23]   SPR asserts that "[n]either Fiztpatrick nor Brodsky know what COPD is and neither understands COPD to be a condition that limits the ability of a person to work or engage in any other life activities or normal bodily or mental functions." (Def.'s State. of Undisp. Facts at ¶ 38)(citing Fitzpatrick Dep. at 118; Fitzpatrick Decl. at ¶ 26; Brodsky Decl. at ¶¶ 13-14)

**E.**

Lastly, Grazioli claims that SPR failed to give her FMLA medical leave while she was absent from work due to short term disabilities.

The FMLA mandates that "an eligible employee shall be entitled to a total of twelve workweeks of leave during any twelve month period" if the employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee."[24]  29 U.S.C. § 2612(a)(1)(D). Section 2615(a)(1) of the FMLA makes it "unlawful for any employer to . . . deny the exercise of . . . any right provided under this subchapter."  The regulations implementing the FMLA make clear that "[i]n all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee."  29 C.F.R. § 825.208(a).

In support of its motion for summary judgment SPR has submitted Grazioli's four Applications for Short Term Disability Benefits, which document that her requests for leave were approved by a manager and by Human Resources.  Significantly, the sentence directly above Grazioli's signature on each form reads:

---

[24]  A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  SPR apparently does not dispute that Grazioli's recurrent upper respiratory infections were a "serious health condition."

"*I understand that while out on Short Term Disability my time
will count toward Family Medical Leave.*" (emphasis in original)
(Grazioli Dep. Exs. D-13 – D-16)

Additionally, Fitzpatrick states that "SPR provided Ms.
Grazioli with FMLA leave during the time that she was away from
work collecting STD [short term disability] benefits."
(Fitzpatrick Decl. ¶ 15)

Grazioli puts forth no evidence in opposition.  She merely
denies SPR's assertion that her FMLA leave ran concurrently with
her short term disability leave.  (See Pl.'s Resp. to Def.'s
Stmt. of Undisp. Facts at ¶ 18)

"The plain language of Rule 56(c) mandates the entry of
summary judgment . . . against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear
the burden of proof at trial.  In such a situation, there can be
'no genuine issue as to any material fact,' since a complete
failure of proof concerning an essential element of the nonmoving
party's case necessarily renders all other facts immaterial."
*Celotex*, 477 U.S. at 322; Fed. R. Civ. P. 56(e) (A party opposing
summary judgment cannot rest upon the "mere allegations or
denials of the adverse party's pleading" but must respond with
affidavits or depositions setting forth "specific facts showing
that there is a genuine issue for trial.").

36

Accordingly, summary judgment for SPR is warranted on Grazioli's FMLA claim.

### IV.

For the foregoing reasons, the Court will grant summary judgment as to the FMLA claim and the ADA claims but deny summary judgment as to the hostile work environment and related retaliation claims under both Title VII and NJLAD.  An appropriate order will be issued.

Dated: December 30, 2005

_____
Joseph E. Irenas, S.U.S.D.J.